IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHERYL MCCRAW, | ) | CASE NO.  1:12 CV 1620 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| THE OHIO BELL TELEPHONE | ) | |
| COMPANY, | ) | MEMORANDUM OPINION |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on Defendant, Ohio Bell Telephone Company's ("Ohio

Bell") Motion for Summary Judgment. (ECF #19).    Plaintiff filed a brief in opposition to the

Motion for Summary Judgment (ECF #22), and Defendant submitted a reply in support of its

motion.  (ECF #23).  Plaintiff, Cheryl McCraw, filed a Complaint in the Cuyahoga County Court

of Common Pleas alleging that she was subjected to adverse employment actions due to racial

and age discrimination in violation of O.R.C. §4112, *et seq*., and in retaliation for filing

discrimination claims with the Equal Employment Opportunity Commission ("EEOC"). (ECF

#1-1).   Defendant removed the case to this federal court on the basis of diversity.  (ECF #1).

For the reasons set forth below, Defendant's Motion for Summary Judgment is GRANTED.

**<u>Facts</u>**[1]

Plaintiff, Ms. McCraw, is an African-American woman who was born in 1957.  (ECF #22-17: McCraw Aff. ¶ 1).  She worked for Defendant, Ohio Bell, from March of 1995 through December of 2012.  (McCraw Depo. at 43; McCraw Aff. ¶¶ 3-5, 10; ECF #1-1 ¶ 15).  She was notified in October that she was being "surplussed" as part of a reduction in force, which meant she would terminated from her current position, but had permission to reapply for a different position within the company.  (McCraw Depo. at 436, 437; McCraw Aff. ¶ 10, 43).  At the time of her termination, Ms. McCraw held the position of "coach manager" in the Cleveland AT&T Global Business Customer Care Center, a position she had held since January of 2008.  (McCraw Depo. at 31-32).  In this position, Ms. McCraw supervised a team of customer service and sales specialists who addressed billing inquires and disputes.  (McCraw Depo. at 276).  These inquiries or disputes were referred to as "tickets."  During the time period at issue in this case, Ms. McCraw reported to Center Manager Michael Bridge, who was at the same location.  He became her direct supervisor in early 2008.  (McCraw Aff. ¶ 9).  Mr. Bridge reported to Director Robyn Garlan, who was located off-site in Saginaw, Michigan.  (McCraw Depo. at 47-48).

A coach manager's job was to provide her team with coaching and developmental tools to ensure that they performed their duties timely, efficiently, and accurately.  (Bridge Decl. ¶ 6).  Coach manager had to approve billing adjustments over $999.99, and were authorized to approve adjustments up to $49, 999.00.  (McCraw Depo. at 110-111).  In addition to authorizing adjustments and providing general guidance to their team, coach managers were required to

---

[1]Except as otherwise cited, the factual summary is based on the parties' statements of fact.  Those material facts which are controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most favorable to Plaintiff, the non-moving party.

balance their team's workloads, review the number of tickets assigned to each member of the team at least daily to ensure they were being timely handled, ensure that team members were properly prioritizing tickets and meeting promised deadlines.  (McCraw Depo. at 99-101; Bridge Depo. at 98; Bridge Decl. ¶6).  According to Mr. Bridge, in 2010, Ms. McCraw was not managing her workload balancing responsibilities or ensuring that the tickets assigned to her team were appropriately prioritized and timely resolved.   (Bridge Decl. ¶15).

Coach managers were also required to monitor their team members through a process called "Manage by Walking Around" or "MBWA."  (McCraw Depo. at 70, 74-78; Bridge Depo. at 93-98).   This required the manager to physically walk around the Center and observe each team member for a few minutes, provide simultaneous feedback to the team member, and then record observations in an on-line database called CCA.  (Id.).  This was to be done for every team member, every day.  Ms. McCraw understood this to be a requirement for her position, and that it was important to the company, but stated that fulfilling this expectation could take up to three hours a day.  (McCraw Depo. at 80).  She believed this was too much time to be spending on MBWAs.  (Id.). Mr. Bridge testified that Ms. McCraw failed to perform her required MBWAs in 2010.  (Bridge Decl. ¶ 15).  Ms. McCraw admitted that she did not perform and/or log MBWAs for several months but offered excuses as to why these jobs were not done. (McCraw Depo. at 16-20, 222-224).  Ms. McCraw explained that for a period of three weeks in March/April all but three of her team members were in training, therefore, she did not do MBWAs for any of the employees.  She also stated that she did not think it worth the time it took to do them when her team members returned from training because they were all trying to catch up on a back log of tickets.  (McCraw Depo. at 16-20, 80-86).  She admitted that her failure to do

regular MBWAs continued from March through June even though her team members returned to work in early April.  (McCraw Depo. at 222-224).  She also admitted that Mr. Bridge had talked to her once or twice about her failure to perform the MBWAs, and she had been disciplined for failing to perform them.  (McCraw Depo. at 85-86, 223).

With regard to the lack of entries memorializing MBWAs, Ms. McCraw also stated that she told Mr. Bridge she had done MBWAs and entered them into the system but that they must have been tampered with.  (McCraw Depo. at 86-90).  After Mr. Bridge had a keystroke analysis done on her computer to see if someone could have tampered with her records, she admitted that she had not inputted any of the data.  (McCraw Depo. at 88-89).  She also could not locate any notes showing that she had done the MBWAs despite having testified that it was her practice to always keep notes and to retain those notes even after inputting had been completed.  (McCraw Depo. at 86-90).

Coach managers were also responsible for responding to "escalations."  Escalations occurred when a team member did not respond timely to a ticket or a customer requested attention from a manager.  (McCraw Depo. at 127-130; Bridge Depo. at 102-103).   A coach manager was required to respond to an escalation within twenty-four hours, and preferably by noon of the day it was received if it was received in the morning.  (McCraw Depo. at 130-131; Bridge Depo. at 101).  When a coach manager was not appropriately responsive, the escalation would go to Mr. Bridge. Ms. McCraw was aware of this requirement and agreed that she had not always been timely in her responses.  (McCraw Depo. at 130-131, 137, 158, 196).  According to Mr. Bridge, he received an unusually high number of escalations in 2010 due to the lack of responsiveness by Ms. McCraw and her team members.  (Bridge Decl. ¶ 15).

Prior to 2010, Ms. McCraw had never been formally disciplined and her overall ratings on her performance reviews showed her as "meets expectations" and "meets and may exceed some goals." (McCraw Aff. ¶ 11, 12; ECF #22-4, 22-5, 22--6).  These ratings are in the middle of the rating scale.  (ECF #22-4, 22-5, 22-6).  In 2007 her evaluation was mediocre at best, indicating that she could not be rated higher than "meets expectations" and that she had started to "miss commitments in her deliverables – including completing evaluative observations and coaching."  (ECF #22-4).  Further, the evaluation noted that she did not complete her part of the evaluation and expectation report, and her failure to complete her deliverables commitments left her peers scrambling to complete her assignments by the deadlines.  (ECF #22-4). This evaluation was performed prior to her joining the Business Solutions Center, and was completed not by Mr. Bridge, but by her prior supervisor.

In 2008, her first evaluation by Mr. Bridge, her evaluation noted that she was generally very successful in her leadership role and in controlling her teams disputes.  (ECF #22-5).  She was being proactive in taking on responsibilities, and had reduced escalations toward the end of 2008 and into the beginning of 2009.  (*Id.*). Overall, the evaluation notes that her handling of escalations needed improvement, however, and that she conveyed impatience and irritation to the customers leading to further escalations to her own supervisors.  (*Id.*).   The evaluation also indicated that she did not follow through on projects she had been asked to address; that she did not consistently perform quality reviews; and, that she did not report any new accomplishments in her self evaluation.  (*Id.*).   Her last written performance evaluation from Mr. Bridge, at the end of 2009, listed her areas for future development as "24 hour maximum turnaround on all escalations, both internal and external."  (ECF #22-6).  It also indicated that Ms. McCraw

"would be the first to admit she had been somewhat going through the motions over the last year or so.  That does not mean that Cheryl does not do a good job.  It simply means that Cheryl has a defined ceiling in how much effort she want to put into Coaching, and that ceiling is lower than her true capabilities.  I would like Cheryl to make a firm decision in 2010 to either break through the ceiling I know exists and the consistent high performer I know she can be- or - [m]ake a commitment to find a job that re-energizes Cheryl's true talents.  I am not sure what opportunities will exist within Cleveland for other managerial roles, but should Cheryl decide that Coaching is not what she wants to do, I would be happy to work with her to find a position that meets her managerial desires."  (*Id*).  Her overall performance level at mid year was given no value, and at years end was listed as "meets and may exceed some goals."  (*Id*.).  Ms. McCraw electronically signed each evaluation and added no end of year employee comments.  Ms. McCraw did not challenge, counter, comment on, or otherwise address any of the comments made or issues raised in her evaluations.

When Mr. Bridge was required to rank his employees in connection with a reduction in force,[2] in June of 2010, Ms. McCraw and Mr. Joshua Brown were ranked at the bottom of the list.  Ms. McCraw is, as stated above, an African-American woman who was in her early fifties at the time.  Mr. Brown was a thirty year old Caucasian man.    Both were slated for termination as part of the reduction in force based on their rankings.  Both had been performing beneath their abilities and/or below known expectations.  (Bridge Depo. 55-57, Ex. 5; McCraw Depo. 156, Ex. 7; Bridge Decl. ¶ 15, 17).  Both had been placed on "success plans" in the spring of 2010.

---

[2]

 At the time he was asked to rank his employees, Mr. Bridge was not aware that the rankings would be used to determine who would be terminated in the reduction of force. (Bridge Decl. ¶ 29).

(McCraw Depo. at 189; Bridge Depo. at 75; Bridge Decl. ¶ 21-22, Ex. 1, 2). Neither improved materially after the implementation of the "success plans." (Bridge Decl. ¶ 24). Both were given a final written warning and three-day suspension in June of 2010. (Bridge Depo. 77; Bridge Decl. ¶ 24-26, Ex. 3, 4). In mid-August, Mr. Bridge was informed he would have to terminate two managers. (Bridge Depo. at 28-29). He selected Ms. McCaw and Mr. Brown because they were the two lowest rated managers under his supervision. (Bridge Decl. ¶ 35). Before Mr. Bridge informed Ms. McCaw and Mr. Brown that they had been selected for termination, Mr. Brown resigned, leaving only one position that had to be terminated. (Bridge Decl. ¶ 38-42).

On August 31, 2010, Ms. McCraw filed a Charge of Discrimination with the EEOC and the Ohio Civil Rights Commission alleging race and age discrimination. (McCraw Depo. at 418, Ex. 27). Mr. Bridge learned of the charge in late September or early October. (Bridge Depo. at 147, 152).

Ms. McCaw was notified on October 22, 2010 that her position had been eliminated. (McCraw Depo. at 440-441, Ex. 28). She was given sixty days to find another position within the company. (McCraw Dep. at 446-447). She applied for other positions but did not receive any job offers. Her employment ended on December 22, 2010. (McCraw Depo. at 467). In 2011 the customer care center closed entirely. All of the manager positions were eliminated and the work was distributed to other centers. (Bridge Decl. ¶ 37).

On January 19, 2011, Ms. McCraw filed a second Discrimination charge with the EEOC alleging that she was selected for termination because of her race and in retaliation for filing the first charge. Both EEOC charges were dismissed on a finding of no probable cause.

-7-

## Summary Judgment Standard

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  The court will view the summary judgment motion in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252).  Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citations omitted).  In most

-8-

civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.  However, if the non-moving party faces a heightened burden of proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-mover.  The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury."  *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).  FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate.  *Id.*

Though parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible.  The Sixth Circuit has concurred with the Ninth Circuit that "'it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'"  *Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)).  FED. R. CIV. P. 56(e) also has certain, more specific requirements:

> [Rule 56(e)] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify.  Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit.

> Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.

*Wiley*, 20 F.3d at 225-26 (citations omitted).  However, evidence not meeting this standard may be considered by the district court unless the opposing party affirmatively raises the issue of the defect.

> If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [the Sixth Circuit] will review such objections only to avoid a gross miscarriage of justice.

*Id*. at 226 (citations omitted).

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248.  The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249.  The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## Analysis

Ms. McCraw alleged that she was subjected to termination based on race and age discrimination, and as retaliation for exercising her rights under O.R.C. §4112.99.  The Complaint

-10-

does not specifically assert a violation of any federal laws.  However, the Supreme Court of Ohio has held that "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e *et seq*., Title 42, is generally applicable to cases involving alleged violations of OHIO REV. CODE ANN. § 4112."  *Plumbers & Steamfitters Commt. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192, 196 (1981).  Thus, the Court's consideration of federal case law applies to Plaintiff's state claims. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

## I.  Age Discrimination/Disparate Treatment Claim

There is absolutely no evidence of any discrimination on the basis of Ms. McCaw's age. Age discrimination was not raised in Ms. McCaw's second EEOC claim for discrimination, and Plaintiff has failed to raise any argument or point to any evidence whatsoever to preserve her original claim for age discrimination.  As Plaintiff has apparently abandoned her age discrimination claim by failing to even address it in her opposition to Defendant's Motion for Summary Judgment, this claim must be dismissed.  *See, Shook v. City of Cleveland*, 2006 U.S. Dist. LEXIS 15011, *3 (N.D. Ohio Mar. 31, 2006); *Davis v. Cotting Carriers*, 102 Fed. Appx. 938, 939 (6th Cir. 2004).

## II.  Race Discrimination/Disparate Treatment Claim

Ohio Revised Code §4112  prohibits employers from discriminating against employees on the basis of race.  O.R.C. §4112.99.  "It is well established that the burden is on an employment discrimination plaintiff to establish a *prima facie* case of discrimination."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citations omitted).  A plaintiff may establish a claim of disparate treatment in one of two ways--via indirect or direct evidence.  First, a plaintiff may establish a *prima*

*facie* case of discrimination by showing that (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and, (4) she was replaced by a person outside the class. *Id; Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995).   In the case of a termination precipitated by a reduction in force, where there is no replacement by a person outside the class, the standard for establishing a prima facie case of discrimination is heightened.  *See, Geiger v. Tower Automotive*, 579 F.3d 614, 623-624 (6th Cir. 2009).  In such instances, the fourth element of the prima facie case is modified to require that the plaintiff present "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled her out for discharge for impermissible reasons.  *Id.*

### A.  Prima Facie Case

In this case, Ms. McCaw, is an African American, and therefore, is a member of a protected class.  She has also presented sufficient evidence to create a question of fact as to whether she was qualified for the position from which she was terminated.  She claims that she suffered adverse employment action through termination, and the prior implementation of disciplinary procedures against her. However, Plaintiff is unable to establish the last element required to establish a prima facie case of discrimination. Plaintiff presented no direct or circumstantial evidence of discriminatory intent on the part of the Defendant company or the decision-makers involved in her termination.  Instead, she attempts to rely on a "statistical" breakdown of the fourteen managers who were potentially subject to the reduction in force in two offices, only eight of whom were part of the Cleveland office.[3]   This sample size is unquestionably too small to be statistically significant, and

---

[3]

  Plaintiff argues there were eight managers in place at the time of the reduction in force; Defendant has indicated there were nine.  The analysis remains the same regardless of which number is correct.

cannot support an inference of discrimination. *See, e.g., Williams v. Tyco Elec.*, 161 Fed. Appx. 526, 535 (6th Cir. 2006); *Conley v. U.S. Bank Nat'l Assoc.*, 211 Fed. Appx. 402, 407 (6th Cir. 2006); *Simpson v. Midland-Ross Corp., 823* F.2d 937 (6th Cir. 1987).

Further, even looking at the chosen pool of employees cited by the Plaintiff, six of the fourteen had no relevance to, or influence on the purported statistical inference. Six of the referenced coach/manager positions addressed by Plaintiff were from the Chicago Heights office . According to Plaintiff there were four African-Americans, one Hispanic, and one Caucasian, and the Caucasian was the only manager to maintain a position there after the reduction in force. However, Plaintiff cites no evidentiary support for these assertions, and the Court has found no support for this assertion in the record. Defendant, on the other hand, has presented evidence that the entire Chicago Heights Center was closed and no managers were retained in that office. (Bridge Decl. ¶ 34; Bridge Depo. at 24). Further, there is evidence that despite the closing of that center none of the prior managers were involuntarily terminated, and all had the option to apply for other positions within the company. Three managers, two African-American and one Caucasian, accepted other positions within the company. (Bridge Depo. at 21-23, Ex. 1). The other three managers, two African-American and one Hispanic or Latino, did not apply for other positions within the company and opted to accept a severance plan instead. (Id. at 21-23, 40, Ex. 1). Further, it is difficult to create an inference of discriminatory intent against African-Americans based on the breakdown of a department that before the reduction in staff, was predominately African-American (at a ratio of four-to-one as against non-Hispanic Caucasians).

Looking to the more relevant pool of employees within Plaintiff's Cleveland department, the reduction in force required a two-person reduction in the managerial staff of that office. The two

-13-

people who rated the lowest among the managerial staff, and who were, therefore, chosen for termination were the Plaintiff, a fifty-three year old African-American woman, and Mr. Brown, a Caucasian, thirty year old man.  Mr. Brown quit before he was terminated but after he had been designated as on of the bottom two managers who would otherwise have faced dismissal.  Of the six managers who remained after the reduction in force, two were African-American.  Looking at these numbers, the "statistics" presented, even if they could be considered numerically significant, do not support an inference that the company discriminated against employees on the basis of race.

Further there is direct evidence to indicate that race discrimination did not affect hiring and retention decisions at the Defendant company, or more directly by Mr. Bridge, Ms. McCaw's supervisor.  Ms. McCaw herself testified that Mr. Bride, the person responsible for designating her in the bottom two, and therefore subject to termination, had retained and promoted other African-American employees both before and during this process.  In addition, Mr. Bridge rated a Caucasian male lower than two other African-American managers in his department.  In addition, as noted above, the Chicago Heights office referenced by Plaintiff in her statistical argument was predominately staffed by African-American managers.  There is ample evidence in the record to show that the company had anti-discrimination policies in effect and that these policies were incorporated into each yearly evaluation of the managers.  Further, although Ms. McCaw, in retrospect has complained that the consequences were not always severe enough, she has testified that she and her supervisor, Mr. Bridge, addressed complaints of racial insensitivity among employees.  Finally, although there is conflicting testimony as to whether there was a zero tolerance policy with regard to racial insensitivity at the company, Ms. McCraw testified that she believed this to be the case from her training and experience.

Having provided no direct or circumstantial evidence of discrimination, Plaintiff only argues that there should be a statistical inference of discrimination. The pool of employees chosen by Plaintiff in an attempt to establish such an inference, however, is statistically insignificant. Further, a significant portion of the purported pool or relevant employees are not in fact relevant at all. Six of the fourteen chosen as representative are not similarly situated for purposes of analyzing the reduction in force decisions. Further, even if they were representative, as set forth above, they counter rather than enforce the inference of racial discrimination. Therefore, under the relevant standard, Plaintiff has failed to establish even a prima facie case of race discrimination in this instance.

### B. Pretext

In addition, even if Plaintiff had established a prima facie case of discrimination, she cannot show that the Defendants' reasons for terminating her in connection with the reduction in force are a mere pretext for discrimination. When, as in this case, there is no direct evidence of discriminatory intent, which Plaintiff has conceded, the court applies the familiar burden-shifting approach for inferential proof of discrimination set forth in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981) and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The Sixth Circuit has described this approach as follows: once a prima facie case had been established, and the employer has articulated some legitimate, nondiscriminatory reason for its action, in order to prevail the plaintiff must prove that the stated reason was in fact pretextual. *Harrison v. Metropolitan Gov't of Nashville and Davidson County*, 80 F.3d 1107, 1115 (6th Cir. 1996). While the burden of persuasion remains with the plaintiff, the burden of production shifts between the parties once a prima facie case has been established.

In establishing pretext, the plaintiff "may succeed . . . either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.  However, in order to withstand summary judgment, a plaintiff must come forward with evidence demonstrating that the defendant's articulated nondiscriminatory justification is not true. *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1166 (6th Cir. 1996), *amended on denial of reh'g*, 97 F.3d 833 (6th Cir. 1996); *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1082 (6th Cir. 1994).  To make a submissible case on the credibility of his employer's explanation, the plaintiff is required to show by a preponderance of the evidence (1) that defendant's proffered reasons for the adverse employment action had no basis in fact, (2) the proffered reasons did not actually motivate the action, or (3) the reasons were insufficient to motivate the adverse action. *Manzer*, 29 F.3d at 1082.

Mr. Bridge testified that he placed Ms. McCaw at the bottom of the group of managers he supervised taking into consideration the managers' 2009 A & D ratings; their 2010 leadership and performance competencies; their technical expertise; the breadth of their knowledge of the different customer regions and industries serviced by the CCC; and their management experience.  (Bridge Decl. ¶ 31).  According to Mr. Bridge all managers were relatively equal in all categories, with the exception being that Ms. McCaw and Mr. Brown, who were the most experienced of his managers both had unsatisfactory performance in 2010.  (Bridge Decl. ¶ 32).  It also happened to be the case that Ms. McCaw had admitted that she was "burnt out" on the job, and Mr. Brown confessed that he did not feel the position was a good fit for him.  (McCraw Depo. at 159-160; Bridge Depo. at 55-57; Bridge Decl. ¶ 38).  Preferencing attitude and performance over tenure, Mr. Bridge therefore rated Ms. McCaw and Mr. Brown as his bottom two.   (Bridge Decl. ¶ 32, 33, 38).

Ms. McCaw has offered no evidence to contradict the relative equality of manager standings in the categories of 2009 ratings; technical expertise; breadth of knowledge; and, management experience.   The only person Ms. McCaw has contended should have rated lower on these four categories is Ms. Hackney, a Caucasian woman who appears to have had less managerial experience based on her prior performance evaluations, and who was rated slightly lower on her 2009 overall performance rating.[4]  The overall rating is not the only indicator of performance in the evaluation however, and looking at the comments related to the employees' strengths and areas for improvement it is not at all clear that Ms. McCaw's actually outperformed Ms. Hackney in 2009.

Ms. McCaw's 2009 evaluation, listed her areas for future development as "24 hour maximum turnaround on all escalations, both internal and external."  (ECF #22-6).  It also indicated that Ms. McCraw "would be the first to admit she had been somewhat going through the motions over the last year or so.  That does not mean that Cheryl does not do a good job.  It simply means that Cheryl has a defined ceiling in how much effort she want to put into Coaching, and that ceiling is lower than her true capabilities.  I would like Cheryl to make a firm decision in 2010 to either break through the ceiling I know exists and the consistent high performer I know she can be- or - [m]ake a commitment to find a job that re-energizes Cheryl's true talents.  I am not sure what opportunities will exist within Cleveland for other managerial roles, but should Cheryl decide that Coaching is not what she wants to do, I would be happy to work with her to find a position that meets her managerial desires."  (*Id*).  Her overall performance level at mid year was given no value, and at years end was

---

[4]

Ms. Hackney was rated "meets most not all goals," while Ms. McCaw, who had several years more experience was rated "meets and may exceed some goals."  Neither rated in the top two categories of performance.  By all indications however, Mr. Bridge believed that Ms. Hackney was learning and improving, while Ms. McCaw was putting forth less effort and not rising to her level of experience and capability.  (ECF #22-6, 15).

listed as "meets and may exceed some goals."  (*Id*.).

In contrast, In 2009 Ms. Hackney's evaluation indicated that she needed to improve on prioritizing and meeting commitment times, (ECF #22-15), an improvement that was noted for Ms. McCaw as well in her 2008 evaluation.  However, it also showed that 2009 was Ms. Hackney's first year in a supervisory role and she entered a "group in flux."  Mr. Bridge indicated that she worked hard to get herself and her team trained and meet the demands of this new job.  She was moved to the Business Solutions Customer Care organization in the third quarter of 2009 and most of the year she was learning the new skills involved in a new job.  She grew "considerably" in the short time she was with Business Solutions.  She was described as committed and accepting of nothing less than a completely successful solution, as well as open to learning and a good multi-tasker. (*Id*.). Therefore, although Ms. McCaw's overall evaluation category put her one step higher than Ms. Hackney as far as meeting goals, the comments relating to work attitude, improvement, and commitment to excellence put Ms. Hackney in at a higher level.

In addition, Ms. Hackney's 2010 evaluation showed an increase in performance, experience, and overall ratings as compared to her 2009 evaluation. (ECF #22-16).  In contrast, Ms. McCaw's performance deteriorated significantly in 2010.   Ms. McCaw testified that she was burned out on the job.  She admitted that in 2010 she did not did not perform and/or log MBWAs for several months,  (McCraw Depo. at 16-20, 222-224), and that this continued even after Mr. Bridge had talked to her once or twice about her failure to perform the MBWAs, and she had been disciplined for failing to perform them.  (McCraw Depo. at 85-86, 223).  Ms. McCaw also admitted that she was aware that a  coach manager was required to respond to an escalation within twenty-four hours, and preferably by noon of the day it was received if it was received in the morning.  (McCraw Depo. at

130-131; Bridge Depo. at 101), and that she had not always been timely in her responses. (McCraw Depo. at 130-131, 137, 158, 196). She offers no argument or evidence to contradict Mr. Bridge's testimony that he received an unusually high number of escalations in 2010 due to the lack of responsiveness by Ms. McCraw and her team members. (Bridge Decl. ¶ 15). Mr. Bridge also testified that in 2010, Ms. McCraw was not managing her workload balancing responsibilities or ensuring that the tickets assigned to her team were appropriately prioritized and timely resolved. (Bridge Decl. ¶15). Ms. McCraw offered no evidence to contradict this information.

Ms. McCraw also compromised her credibility in her handling of Mr. Bridges' inquiries into missing MBWA reports. She admits in her deposition that she told Mr. Bridge she had done MBWAs and entered them into the system but that they must have been tampered with. (McCraw Depo. at 86-90). After Mr. Bridge had a keystroke analysis done on her computer to see if someone could have tampered with her records, she admitted that she had not inputted any of the data. (McCraw Depo. at 88-89). She also could not locate any notes showing that she had done the MBWAs despite having testified that it was her practice to always keep notes and to retain those notes even after inputting had been completed. (McCraw Depo. at 86-90).

Despite all of these difficulties and Ms. McCraw's deteriorating attention and effort toward performing her job duties, there is absolutely no indication that she would have been terminated if it had not been for the reduction in force that took place in late 2010.[5] Further, there is no evidence that Mr. Bridge contemplated that his rankings would result in Ms. McCaw's termination at the time

---

[5]

. It bears noting that there is no dispute that Ms. McCaw's termination was based solely on a reduction in force, and that, in fact, the entire center was eliminated shortly after in 2011.

he made them.  In fact, he testified that at the time he was asked by his superiors to rank his managers, his team was in a growth mode and he expected that to continue.  (Bridge Decl. ¶ 29, 30).  Therefore, there is no evidence to suggest that he ranked Ms. McCaw at the bottom in order to facilitate her termination or to negatively impact her employment conditions in any way, let alone that this ranking or her termination under the reduction in force was in any way related to or motivated by her race.

Plaintiff has not established any facts that would show Defendant's stated reasons for termination were pretext.  There is no dispute that her position was subject to a reduction in force; she has admitted that she did not agree with and did not follow job requirements that were important to the company, especially in 2010; and, she has admitted that she had been warned of needed improvements prior to 2010.  Therefore, the proffered reason for her termination clearly has a basis in fact.  Further, there is no evidence that Mr. Bridge's decision to rate her at the low end of his managers in a comparison ranking was based on anything other than his perception of her performance and work attitude; and, there is no evidence that his choice of managers who would be terminated due to the reduction in force were chosen from the bottom two rankings.  In addition, the fact that the other lowest rated employee, who quit before being subject to termination was a younger Caucasian male, and other African-American managers were not terminated, belies the allegations that his proffered reasons were pretext for racial discrimination.  Therefore, there is no evidence that would support a finding that the proffered reasons for Ms. McCraw's termination were not the actual reason, whether or not she agreed with her performance assessment.  Finally, there is no evidence that in a reduction in force situation, a good employee might still be subject to termination if she nonetheless rates below other manager in terms of performance and/or attitude.

-20-

Comparatively diminishing performance, even in the case of a generally well performing employee, is sufficient reason for termination when there must be a reduction in force.  Therefore, with regard to Plaintiff's claim of race discrimination based on her termination, summary judgment in favor of the Defendant is warranted.

### III.  Other Adverse Employment Action

Plaintiff also alleges that she suffered adverse employment actions in the form of a three day suspension and submission to a performance improvement plan.  In order to establish an adverse employment action, "a plaintiff must identify a materially adverse change in the terms and conditions of his employment." *Hollins v. Atlantic Company, Inc., et al.*, 188 F. 3d 652, 662(6th Cir. 1999).  A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* No such indices have been alleged, let alone established by the Plaintiff in this case.  As a matter of law, written and verbal warnings do not constitute "adverse employment action" for purposes of establishing a prima facie case of discrimination or retaliation.  *Handshoe v. Community Services for the Deaf*, 2002 WL 649070 (6th Cir. 2002)(holding that a "write-up" and meeting discussing disciplinary violations is insufficient to establish materially adverse employment action in race discrimination or retaliation cases); *Hollins*, 188 F. 3d at 662 (holding a lowered performance rating that does not have an actual effect on wages is insufficient to establish an adverse employment action).  Further, a three-day suspension does not meet the criteria for an adverse change in the terms or conditions of employment, due to its temporary nature and, the lack

-21-

of any lasting effect on the Plaintiff's work environment. *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2001)(holding that a ten-day removal of responsibilities was temporary in nature and therefore did not constitute material adverse employment action)*; Brione v. Indian River School*, NO. 97-3212, 1998 WL 199791, at 4 (6th Cir. 1998)(noting in dicta that a fifteen-day suspension probably does not qualify as adverse employment action).

In addition, Plaintiff does not contest the fact that the disciplinary action she received was in fact preceded  by her willful failure to complete the duties she had been assigned and expected to carry out. There is absolutely no evidence that her suspension was motivated by race, or that the rules were enforced more stringently against African-American employees generally.

### IV.  Retaliation Claim

Ohio Revised Code Chapter 4112  also make it unlawful for an employer to retaliate against an employee who has either: (1) "opposed any practice made an unlawful employment practice by this subchapter," or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (1994). These two provisions are known as the "opposition clause" and the "participation clause." *See Johnson v. University of Cincinnati*, 215 F.3d 561, 578-79 (6th Cir.2000).

To establish a claim of retaliation, the plaintiff must establish a prima facie case, showing that: (1) he engaged in activity protected by Title VII (or chapter 4112); (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between plaintiff's protected activity and the adverse action. *Allen v. Michigan Department of Corrections,* 165 F.3d 405, 411 (6th Cir. 1999);

*Christopher v. Stouder Memorial Hosp.*, 936 F.2d 870, 877 (6th Cir. 1991).  If the plaintiff successfully establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions.  If the defendant comes forward with such a reason and rebuts the prima facie case, the plaintiff must then establish that the nondiscriminatory reason articulated by the defendant was a mere pretext for the alleged discriminatory action. *Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370, 374 (6th Cir. 1984); *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  The plaintiff bears the burden of persuasion throughout the entire process.

### A. Prima Facie Case

Plaintiff has shown that she engaged in activity protected by O.R.C. chapter 4112, and that the defendant knew of this activity.  She alleges that defendant took adverse employment action by terminating her, and by unfairly implementing disciplinary procedures against him.  For the same reasons discussed above in relation to the Disparate Treatment claim, the implementation of disciplinary action is not sufficient to establish an adverse employment action.  Thus, Plaintiff has failed to establish a prima facie case of retaliation with regard to the disciplinary actions.  Her termination is, of course, an adverse employment action that satisfies the third requirement for the establishment of a prima facie case of retaliation.  Nonetheless, the only evidence of causation, which is necessary to create a prima facie case, is that Ms. McCraw was terminated after she filed the EEOC complaint.  There is, however, ample undisputed evidence that the rating exercise that put Ms. McCraw in the bottom of the manager rankings took place prior to her filing of the EEOC complaint. (Bridge Decl. ¶ 30-31, 44).   Further, there is evidence that the ranking was the sole reason she was chosen for termination in this reduction in force situation.  Admittedly this evidence

comes from Mr. Bridge who was the decision-maker, but he has provided admissible evidence based on information within his personal knowledge, and Ms. McCraw, who has the burden of proving causation has offered no evidence to refute that the decision, if not the announcement, of her termination had been made prior to and without regard to Mr. Bridge's discovery that Ms. McCraw had filed and EEOC complaint. *See, Evan v. Celotex, Corp*., 1988 U.S. App. LEXIS 12127, *7 (6th Cir. Sept. 2, 1988)(rejecting plaintiff's argument that the court could not consider declarations offered by employer because they contained "self-serving" statements); *Kinds v. Ohio Bell Tel. Co.*, 2012 U.S. Dist. LEXIS 105507, *10 (N.D. Ohio July 30, 2012)(the moving party is not required to file evidence to negate a claim on which the opponent bears the burden of proof); *Mulhall v. Ashcroft*, 287 F.3d 543, 551-52 (6th Cir. 2002)(no retaliation where the decision maker had no knowledge of protected activity at time of decision, and plaintiff failed to refute decision-maker's testimony with specific facts).

### B. Pretext

Further, even if Ms. McCraw could have established a prima facie case of retaliation, for all the reasons discussed in the pretext section of the analysis of the race discrimination claim, she has presented no evidence that the reasons proffered by Mr. Bridge for her termination are mere pretext. Therefore, Plaintiff has failed to overcome her burden and Defendant is entitled to summary judgment on the issue of retaliation discrimination.

### Conclusion

For the reasons set forth above, Defendant's motion for summary judgment (ECF #19) is granted. Pursuant to Fed. R. Civ. Pro. 56, Plaintiff's Complaint is hereby dismissed.

IT IS SO ORDERED.


 /s/ Donald C. Nugent
         DONALD C. NUGENT
United States District Judge


DATED: July 24, 2013